J-A02004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| M.M. | : | No. 1049 WDA 2019 |

Appeal from the Order Dated July 8, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s):  FD 15-005302-001

BEFORE:  SHOGAN, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 05, 2020**

Appellant, J.M. ("Mother"), and Appellee ("Father"), (collectively "Parents"), are the parents of a daughter, A.M., and two sons, S.M. and J.M. (collectively "the Children").  Herein, Mother appeals *pro se* from the July 8, 2019 order that denied her motion to modify custody, granted Father's motion to modify custody, and granted Mother's and Father's individual motions to relocate within Allegheny County.[1]  After careful review, we affirm.

The relevant facts and procedural history are as follows:

> [Parents] separated in 2015 and have been in near-constant conflict over custody of the Children ever since.  The undersigned

_____

[1]  In her July 15, 2019 notice of appeal, Mother states that she is appealing the trial court's July 5, 2019 order.  We note that the trial court's final order in this matter was not time-stamped and entered on the docket until July 8, 2019.  Accordingly, in this Memorandum, we refer to the appealable order as the July 8, 2019 order.  Pa.R.A.P. 301.  We have corrected the appeal paragraph accordingly.

Judge assumed responsibility for the matter in October 2017 after the previously-assigned Judge recused himself. The [c]ourt conducted a custody hearing in the spring of 2018 and issued an order on May 25, 2018 awarding sole legal and primary physical custody to Father (the "May 25th Order"). Mother appealed, and a panel of the Superior Court affirmed this [c]ourt's decision, adopting this [c]ourt's opinion as its own.

While Mother's appeal was pending, Father filed a petition for contempt of the May 25th Order. Mother … also filed a petition for contempt. The [c]ourt conducted a hearing on the parties' respective petitions for contempt in early 2019 and issued an opinion and order on March 29, 2019 (the "Custody Contempt Order"). The [c]ourt dismissed Mother's request for contempt findings against Father and held Mother in contempt for violations of several provisions of the May 25th Order. No appeal was filed. …

At the time of the 2018 custody proceeding, Mother and Father each resided in Churchill, within the Woodland Hills School District, and just a few minutes from each other. During that proceeding, the parties made the [c]ourt aware that they each anticipated moving to new residences. Father filed a Notice of Proposed Relocation on September 21, 2018, seeking to move to a residence in the Gateway School District. Mother filed a Notice of Proposed Relocation on January 8, 2019, seeking to move to Aspinwall, in the Fox Chapel School District. Mother opposed Father's proposed relocation. Following conciliation on November 6, 2018, this [c]ourt issued an interim order, pursuant to 23 Pa.C.S. §5337(g)(3), permitting Father to relocate to the Gateway School District in advance of a hearing. However, Father lost the opportunity to move to the property he had identified and has not yet moved. Following conciliation on January 15, 2019, this [c]ourt permitted Mother to relocate to Aspinwall, and provided that the parties would continue to follow the custody provisions of the May 25th Order.

On January 15, 2019 and March 7, 2019, each of the parties filed petitions for custody modification. By order dated March 7, 2019, the [c]ourt scheduled a hearing on the parties' requests for custody modification and relocation. The [c]ourt heard testimony over the course of two days, on June 11 and June 20, 2019, and announced the [c]ourt's findings and decision on the record on

- 2 -

July 5, 2019[, and the final order was entered on the docket on July 8, 2019].

Witnesses included Mother, Father, and each of the … Children. Both parties submitted numerous exhibits. Mother's exhibits amounted to approximately 886 pages. For purposes of courtroom management and judicial economy, the [c]ourt admitted all of the parties' offered exhibits, but cautioned the parties that upon the [c]ourt's review of the exhibits, hearsay statements and documents outside the scope of the hearing would carry little weight. The [c]ourt also incorporated the record of the custody contempt proceeding held on January 31, 2019 and February 15, 2019, consisting of two transcripts totaling 532 pages and numerous pages of exhibits.

The [c]ourt considered all evidence related to the period following issuance of the May 25th Order. In general, the evidence revealed that since issuance of that order, Mother has devoted much of her energy to her efforts to undo it. Frequent conflict between [Parents] has continued. However, the May 25th Order has limited the scope and effect of that conflict, and overall the record reflects a custody arrangement that is serving the Children relatively well.

Because Father now exercises sole legal custody, the constant conflict and misconduct by Mother that previously occurred in communications with the schools and in health care providers' offices no longer occurs. A.M., the parties' daughter, has excelled in school, and her younger brothers both have performed well. The Children's school attendance has been consistent and nearly perfect. Father has maintained A.M.'s treatment for Postural Tachycardia Syndrome (POTS) by a specialist in Cleveland, and A.M.'s health has been good. The Children continue to enjoy their participation in various organized sports. The Children all like spending time at Mother's new rental home and neighborhood in Aspinwall. The Children make no major complaint about either parent individually. They do clearly desire the constant conflict between Parents to end. Notably, both Father and A.M. discern some calming of the overall atmosphere in recent months.

That said, these positive developments have occurred in the context of what remains weekly, if not daily, conflict between Parents, which occurs mostly in the form of email and text

- 3 -

message exchanges. The Children's attendance at their sports practices and events has remained a flash point, with frequent arguments over transportation logistics. Arguments over whether Parents have necessary supplies of the Children's medications continue. Mother violated the provisions of the May 25th Order over a period beginning almost immediately after the [c]ourt entered it and continuing up through the date of the Contempt hearing. Mother makes frequent demands for Father to do various things that the May 25th Order does not require him to do, some of which she actually remains entitled to do herself. For example, Mother demanded that Father keep doctors' appointments that she had scheduled for the Children prior to the entry of the May 25th Order. In addition, Mother insisted that Father was responsible for providing Mother with school records, despite the May 25th Order providing her with access to those records.

It was against this background that the [c]ourt considered the parties' competing requests for custody modification and relocation.

Trial Court Opinion, 10/7/19, at 2-7 (footnotes omitted). On July 8, 2019, the trial court granted Father's request for custody modification and approved both parties' respective requests for relocation. Mother filed a timely appeal.

It is undisputed that this matter is a children's fast track appeal. *See* Pa.R.A.P. 102 (a children's fast track appeal is any appeal from an order involving dependency, termination of parental rights, adoptions, custody or paternity). In such cases, the concise statement of errors complained of on appeal must be filed and served with the notice of appeal. Pa.R.A.P. 1925(a)(2)(i). A review of the record reveals that Mother failed in this regard.

Mother filed her notice of appeal on July 15, 2019; however, she did not file her concise statement of errors complained of on appeal until July 23, 2019.[2]

In her concise statements of errors complained of on appeal, Mother raised the following issues, which we state *verbatim*:

1. Did the trial court erred or abuse its discretion by creating a custody Order that divests Mother from her parental role without substantive and sufficient evidence and against evidence entered into record that such is in the best interest of the Children, including but not limited to:

   (a) By awarding Father primary physical custody and sole legal custody of the minor Children?

   (b) By failing to modify the custody order in the best interest of the children?

   (c) By failing to apply § 5328(a) and § 5337(h)?

   (d) By failing to carefully consider the children's strong preference for additional custody time with their Mother?

2. Did the trial court abuse its discretion or commit an error of law by misapprehending the law by failing to apply § 5337?

3. Did the trial court abuse its discretion or commit an error of law by misapprehending the law by failing to ensure the best interest/ welfare of the children including but not limited to:

   (a) By circumventing the State's court Order regarding Children's school accommodations?

4. Did the trial court abuse its discretion or commit an error of law by misapprehending the law by imposing a heightened standard on Mother and a diminished standard on Father?

_____

[2] Mother failed to properly file her concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). Accordingly, in this Memorandum, when we refer to Mother's "concise statement," we are referring to the subsequently filed Pa.R.A.P. 1925(b) statement.

5. Did the trial court abuse its discretion or commit an error of law by issuing the Order entered on July [8], 2019, as the Schedule imposed will serve to damage and substantially impact the relationship between Mother and the Children?

6. Did the trial court erred or abuse its discretion by creating a custody Order that divests Mother from her parental role without substantive and sufficient evidence and against evidence entered into record that such is in the best interest of the Children, including but not limited to:

(a) by ordering that Mother is prohibited from bringing any concerns to the attention of the Children's school and being prohibited from contacting the school without Father's authorization;

(b) by ordering that Mother is prohibited from attending all parent teacher conferences, open houses, and other regularly scheduled school meetings and activities unless authorized by Father and by requiring Mother to leave if there is an issue at one of these events irrespective of the circumstances;

(c) by ordering that only Father can schedule and attend routine and specialist medical appointments unless Mother is authorized by Father to attend;

(d) by ordering that Mother cannot speak to any medical or education providers if Mother thinks there is an issue unless Father authorizes the same;

(e) by requiring Mother to pay for all activities agreed upon by the parties if Father merely asserts he cannot afford the same;

(f) by reducing further Mother's physical custody time;

(g) By commencing Mother's custody time to begin after school or activities for which school provides transportation have concluded?

(h) by limiting communication between the Mother and the Children during Father's custodial time when Mother and the Children enjoyed regular communication;

(i) by sacrificing Mother's holiday time for Father's need for holiday time without real reason;

(j) by failing to recognize and account for the close and bonded relationship of the Children to their Mother.

7. Did the Court error or abuse its discretion by violating Mother's civil rights?

8. The Judge committed errors through various evidentiary rulings that cannot be specifically identified at the time this statement is filed due to the Children's Fast Track requirement that the statement be filed with the Notice of Appeal and not making her opinion available to the parties before this Concise Statement of Errors was due.

Pa.R.A.P. 1925(b) Statement, 7/23/19, at ¶¶1-8 (*verbatim*).

However, in the statement of questions involved in her brief, Mother purports to present the following claims of error, which we set forth *verbatim* below:

1. Whether the Trial Court abused it discretion or made an error of law by disregarding evidence and testimony of [Mother] stating it was outside the scope the hearing?

2. Whether the Trial Court abused it discretion or made an error of law by not allowing parties to object or state hearsay?

3. Whether the Trial Court abused it discretion or made an error of law by not submitting the entire original record?

4. Whether the Trial Court modified a custody order by failing to apply § 5328(a) & § 5337(h)?

5. Whether the trial court abuse its discretion or commit an error of law by failing to ensure the best interest/ welfare of the children by violating their Civil Rights when she circumvented the State's court Order regarding Children's school accommodations?

6. Whether the Trial Court abused it discretion or made an error of law by requiring Mother to pay for all activities agreed upon by

the parties if Father merely asserts he cannot afford the same without performing an income verification?

7. Whether the Trial Court abused it discretion or made an error of law by placing a heightened standard upon Mother and a diminished standard on Father?

8. Whether the Trial Court abused it discretion or made an error when awarding Father … sole legal and primary custody of the [Children] when the overwhelming weight of evidence supports awarding Mother … sole legal and primary physical custody of the [C]hildren.

Mother's Brief at 8-9. It is well settled that any issues not raised in the concise statement will be deemed waived on appeal. *Commonwealth v. Castillo*, 403, 888 A.2d 775, 780 (Pa. 2005); *see also Lineberger v. Wyeth*, 894 A.2d 141, 148 n.4 (Pa. Super. 2006) (noting that the principles enunciated in criminal cases surrounding application of Rule 1925(b) and concise statements of errors complained of on appeal apply equally to civil cases).

After review, we conclude that the majority of the issues Mother presented in her brief bear no relation to the issues raised in her Pa.R.A.P. 1925(b) statement. In light of the disparity between the Rule 1925(b) statement and her brief on appeal, we could find Mother's issues waived. *See B.G. Balmer & Co., Inc. v. Frank Crystal & Company, Inc.*, 148 A.3d 454, 467 (Pa. Super. 2016) (issues that are not included in the concise statement of errors complained of on appeal or fairly suggested thereby are deemed waived). However, we point out that in an effort to address as completely as possible Mother's claims of error, the trial court generously construed Mother's issues as follows:

- 8 -

[1.] A complaint that the [c]ourt held Mother to a higher burden of proof/standard of evidence than the [c]ourt applied to Father[.] Mother's Error #4[.]

[2.] A general complaint that the [c]ourt failed to consider all the required custody and relocation factors and that the evidence did not support the [c]ourt's conclusions[.] Mother's Errors #1, 2, 5, 6[.]

[3.] Vague complaints that the Court circumvented an order in a special education dispute between Mother and the Children's school district, violated Mother's civil rights, and erred in unspecified evidentiary rulings[.] Mother's Errors #3, 7 and 8[.]

Trial Court Opinion, 10/7/19, at 7-8.

This Court's scope and standard of review over appeals from decisions made pursuant to the Child Custody Act, 23 Pa.C.S. §§ 5321-5340, is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.
>
> **C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted). **See E.R. v. J.N.B.**, 129 A.3d 521, 527 (Pa. Super. 2015).
>
> This Court consistently has held:

- 9 -

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (quotation omitted). In addition,

although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

*M.A.T. v. G.S.T.*, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations omitted).

The paramount concern in any custody case decided under the Act is the best interests of the child. *See* 23 Pa.C.S.A. §§ 5328, 5338.

*T.D. v. E.D.*, 194 A.3d 1119, 1122-1123 (Pa. Super. 2018). Moreover, we note that when faced with a motion for relocation, the trial court must consider the relocation factors listed in 23 Pa.C.S. § 5337(h) and the custody factors listed in 23 Pa.C.S. § 5328(a). *A.M.S. v. M.R.C.*, 70 A.3d 830, 835 (Pa. Super. 2013).

We have reviewed the briefs of the parties, the relevant law, the certified record before us on appeal, and the trial court opinion filed on October 7, 2019. A review of the record reveals that the trial court aptly considered all

- 10 -

of the factors set forth in 23 Pa.C.S. §§ 5337(h) and 5328(a). N.T., 7/5/19 at 16-34. Moreover, we conclude that the trial court's opinion identifies and addresses Mother's challenges to the July 8, 2019 order. Consequently, we affirm on the basis of the trial court's opinion and adopt its analysis as our own. The parties are directed to attach a copy of the October 7, 2019 opinion in the event of further proceedings in this matter.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/5/2020

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## FAMILY DIVISION

| | |
|---|---|
| J.M., | **CHILDREN'S FAST TRACK** |
| Appellant, | FD 15-005302-001 |
| v. | 1049 WDA 2019 |
| M.M., | **OPINION** |
| Appellee. | |

By:

The Honorable Eleanor L. Bush
Allegheny County Court of Common
Pleas
440 Ross Street, Suite 5045
Pittsburgh, PA 15219

Copies to:

Pennsylvania Superior Court

Nicholas V. Corsetti, Esq.,
Deputy Prothonotary
310 Grant St., Suite 600
Pittsburgh, PA 15219

*Pro Se* Appellant,

J.M.
230 3rd Street
Pittsburgh, PA 15215

*Pro se* Appellee,

M.M.
75 Bowstone Road
Pittsburgh, PA 15235

# IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
## FAMILY DIVISION

| | |
|---|---|
| J.M., | **CHILDREN'S FAST TRACK** |
| Appellant, | FD 15-005302-001 |
| v. | 1049 WDA 2019 |
| M.M., | **OPINION** |
| Appellee. | |

## OPINION

Bush, J.                                                       October 7, 2019

A.M., S.M., and J.M., (collectively, the "Children") are the children of J.M. ("Mother") and M.M. ("Father"). On July 5, 2019, following two days of testimony on the parties' competing requests for custody modification and relocation, the Court announced its decision to grant Father's request for custody modification and to approve both parties' respective requests for relocation. Mother filed a timely appeal.

## I. Background

The parties separated in 2015 and have been in near-constant conflict over custody of the Children ever since. The undersigned Judge assumed responsibility for the matter in October 2017 after the previously-assigned Judge recused himself.

2

The Court conducted a custody hearing in the spring of 2018 and issued an order on May 25, 2018 awarding sole legal and primary physical custody to Father (the "May 25th Order"). Mother appealed, and a panel of the Superior Court affirmed this Court's decision, adopting this Court's opinion as its own.[1]

While Mother's appeal was pending, Father filed a petition for contempt of the May 25th Order. Mother subsequently also filed a petition for contempt. The Court conducted a hearing on the parties' respective petitions for contempt in early 2019 and issued an opinion and order on March 29, 2019 (the "Custody Contempt Order"). The Court dismissed Mother's request for contempt findings against Father and held Mother in contempt for violations of several provisions of the May 25th Order. No appeal was filed. A copy of the Custody Contempt Order is attached hereto as Appendix B.

At the time of the 2018 custody proceeding, Mother and Father each resided in Churchill, within the Woodland Hills School District, and just a few minutes from each other. During that proceeding, the parties made the Court aware that they each anticipated moving to new residences. Father filed a Notice of Proposed Relocation on September 21, 2018, seeking to move to a residence in the Gateway School District. Mother filed a Notice of Proposed Relocation on January 8, 2019,

---

[1] J.M. v. M.M., 914 WDA 2018 (February 22, 2019). A copy of this Court's Opinion in support of the May 25th Order is attached hereto as Appendix A.

seeking to move to Aspinwall, in the Fox Chapel School District. Mother opposed Father's proposed relocation. Following conciliation on November 6, 2018, this Court issued an interim order, pursuant to 23 Pa. C.S. §5337(g)(3), permitting Father to relocate to the Gateway School District in advance of a hearing. However, Father lost the opportunity to move to the property he had identified and has not yet moved. Following conciliation on January 15, 2019, this Court permitted Mother to relocate to Aspinwall, and provided that the parties would continue to follow the custody provisions of the May 25th Order.[2]

On January 15, 2019 and March 7, 2019, each of the parties filed petitions for custody modification. By order dated March 7, 2019, the Court scheduled a hearing on the parties' requests for custody modification and relocation. The Court heard testimony over the course of two days, on June 11 and June 20, 2019, and announced the Court's findings and decision on the record on July 5, 2019.

Witnesses included Mother, Father, and each of the three Children. Both parties submitted numerous exhibits. Mother's exhibits amounted to approximately 886 pages. For purposes of courtroom management and judicial economy, the Court admitted all of the parties' offered exhibits, but cautioned the parties that upon the Court's review of the exhibits, hearsay statements and documents outside

---

[2] Order of Court (January 16, 2019).

4

the scope of the hearing would carry little weight.[3] The Court also incorporated the record of the custody contempt proceeding held on January 31, 2019 and February 15, 2019, consisting of two transcripts totaling 532 pages and numerous pages of exhibits.[4]

The Court considered all evidence related to the period following issuance of the May 25th Order.[5] In general, the evidence revealed that since issuance of that order, Mother has devoted much of her energy to her efforts to undo it. Frequent conflict between Parents has continued. However, the May 25th Order has limited the scope and effect of that conflict, and overall the record reflects a custody arrangement that is serving the Children relatively well.

Because Father now exercises sole legal custody, the constant conflict and misconduct by Mother that previously occurred in communications with the schools and in health care providers' offices no longer occurs. A.M., the parties' daughter, has excelled in school, and her younger brothers both have performed well.[6] The Children's school attendance has been consistent and nearly perfect.[7] Father has maintained A.M.'s treatment for Postural Tachycardia Syndrome

---

[3] Tr. at 3 (June 20, 2019).
[4] *Id.* at 90-91.
[5] Mother's testimony and exhibits included a focus on events prior to issuance of the May 25th Order. Since these events fell outside the scope of the current proceeding, the Court accorded them no weight.
[6] *See* Father's 2019 Custody/Relocation Exhibits #1 - #3.
[7] *Compare* Appendix A at 9-10 (Mother's failure to consistently send children to school weighed in favor of granting primary physical custody to Father).

5

(POTS) by a specialist in Cleveland, and A.M.'s health has been good.[8] The Children continue to enjoy their participation in various organized sports.[9] The Children all like spending time at Mother's new rental home and neighborhood in Aspinwall.[10] The Children make no major complaint about either parent individually. They do clearly desire the constant conflict between Parents to end.[11] Notably, both Father[12] and A.M.[13] discern some calming of the overall atmosphere in recent months.

That said, these positive developments have occurred in the context of what remains weekly, if not daily, conflict between Parents, which occurs mostly in the form of email and text message exchanges. The Children's attendance at their sports practices and events has remained a flash point, with frequent arguments over transportation logistics.[14] Arguments over whether Parents have necessary supplies of the Children's medications continue.[15] Mother violated the provisions of the May 25th Order over a period beginning almost immediately after the Court entered it and continuing up through the date of the Contempt hearing. Mother

---

[8] Tr. at 141-142 (June 11, 2019).
[9] Children's Testimony at 13-16 (J.M.), 39-45, 50 (S.M.), 57-60 (A.M.) (June 11, 2019).
[10] Id. at 22, 48, 63.
[11] Id. at 29, 31-32 (J.M.), 73-77 (A.M.).
[12] Tr. at 118 (June 20, 2019).
[13] Children's Testimony at 70, 73-74 (June 11, 2019).
[14] See Appendix B at 5-6; Tr. at 102-105 (June 11, 2019) (Mother's testimony); Id. at 149-152 (Father's testimony).
[15] Tr. at 170-171 (June 11, 2019).

makes frequent demands for Father to do various things that the May 25th Order does not require him to do, some of which she actually remains entitled to do herself. For example, Mother demanded that Father keep doctors' appointments that she had scheduled for the Children prior to the entry of the May 25th Order. In addition, Mother insisted that Father was responsible for providing Mother with school records, despite the May 25th Order providing her with access to those records. [16]

It was against this background that the Court considered the parties' competing requests for custody modification and relocation.

## II.  Issues on Appeal

Mother asserts eight errors, some with multiple subparts, for a total of 20 issues. Some of the asserted errors are repetitive. Some repeat verbatim errors Mother asserted in her appeal of the May 25th Order. Without restating each of Mother's issues here, the Court views them as falling into the following general groups:

- A complaint that the Court held Mother to a higher burden of proof/standard of evidence than the Court applied to Father [Mother's Error #4]

---

[16] Appendix B at 6.

- A general complaint that the Court failed to consider all the required custody and relocation factors and that the evidence did not support the Court's conclusions [Mother's Errors #1, 2, 5, 6]

- Vague complaints that the Court circumvented an order in a special education dispute between Mother and the Children's school district, violated Mother's civil rights, and erred in unspecified evidentiary rulings [Mother's Errors #3, 7 and 8]

## III.  Standard of Review

When a trial court orders a form of custody, modifies custody, or permits relocation, the best interests of the children are paramount.[17] To determine the children's best interests, the trial court must consider the custody factors enumerated in 23 Pa. C.S. § 5328(a) and the relocation factors enumerated in 23 Pa. C.S. § 5337(h).

When reviewing the trial court's decision, the Superior Court applies the following standard of review:

> In reviewing a custody order, ... [w]e must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by

---

[17] 23 Pa. C.S. § 5328, 5337(i), 5338.

the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.[18]

## IV. Discussion

### A. The Court applied the proper burden of proof and standard of evidence to its evaluation of the record.

Each party requested that the Court modify the status quo created by the May 25th Order. Under the governing order, Father exercises sole legal custody of the Children. He exercises primary physical custody of the Children, but the summer custody schedule provides for equally shared physical custody. Mother requested that the Court modify that order to award her sole legal custody and primary physical custody. Father requested that the Court modify the order to alter the summer custody schedule and grant him primary physical custody throughout the year. In addition, each party sought relocation.

Since each party sought to alter the status quo, each party bore the burden of proving to the Court that the requested modification and requested relocation serve the Children's best interests.[19] Similarly, each party needed to demonstrate to the Court that a preponderance of the evidence supported their request.

---

[18] *C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (Standard of review applied to relocation and custody modification case).
[19] *See* 23 Pa. C.S. § 5337(i) (Burden of proof for relocation); *J.M.R. v. J.M.*, 1 A.3d 902, 911 (Pa. Super. 2010) (Burden of proof for custody modification).

Mother sought a far more significant change to the status quo than Father. Accordingly, the Court observed in announcing its decision that it would have taken significant evidence for the Court to essentially reverse itself and grant Mother the same relief that the Court denied barely a year prior to the proceeding in this matter, only four months after the Superior Court affirmed that decision, and only three months after the Court found Mother in contempt for violating provisions of the governing order.[20] The Court did not err in making this observation, the Court's comment did not amount to imposition of a different burden of proof, and the record does not otherwise demonstrate that the Court misunderstood or misapplied the applicable standards.

## B. The record supports the Court's conclusion that Father's proposed modification and relocation served the Children's best interests.

As required by law, the Court considered all enumerated factors regarding custody and relocation (*i.e.*, 27 separate enumerated factors) to reach its conclusions regarding the Children's best interests. The Court announced its findings regarding each factor on the record with both parties present.[21] The Court weighed ten factors in Father's favor, weighed no factors in Mother's favor, and found all 17 other factors either neutral or not applicable. The Court will review those findings here. Individual custody and relocation factors that address the same

---

[20] Tr. at 16-19 (July 5, 2019).
[21] Tr. at 20-34 (July 5, 2019).

or substantially similar concepts will be addressed together. The Court summarizes its analysis here, but does not attempt to identify all of the facts of record that support its decision. The transcript of the hearing and admitted exhibits include additional support for the Court's findings.

The Court weighed Custody Factor #1 and Relocation Factor #5 slightly in Father's favor. For the most part, Mother does not prevent the Children from spending time in Father's physical custody in accordance with the schedule in the May 25th Order, but she has done so on occasion, resulting in two of the findings against her in the Custody Contempt Order.[22] Mother also proposed a physical custody schedule that amounted to a significant reduction in the Children's time with Father.[23] Her proposal for a several-month period in the fall/winter months would have removed all weekend time from Father and allowed him only two nights per week with the Children. Father's proposed physical custody schedule did reduce the Children's time with Mother somewhat, but in a far less drastic way. Thus, the Court concluded that the evidence on this factor favored Father.

The Court viewed Custody Factors #2 and 2.1 and Relocation Factor #9 as not applicable.

---

[22] *See* Appendix B at 3-4, 11 (Mother in contempt of the Winter Break and Vacation provisions).
[23] Tr. at 74-75 (June 20, 2019); *See also* Mother's Exhibit K2.

11

The Court viewed Custody Factor #3 as neutral. The Court views both Parents as capable of performing a range of parental duties and recognizes that each does so when the Children are in their custody. As sole legal custodian, Father has greater responsibility than Mother, but that did not cause the Court to weigh this factor against Mother. The Court notes that Mother vehemently criticizes Father's performance of many of his duties, including educational decisions, attending to the Children's health care, and meeting the Children's basic needs for food, clothing and appropriate living conditions.[24] The Court did not find Mother's evidence persuasive. She implacably opposes Father's educational choices, but the Children have performed well in school. In a rare acknowledgement of Father's appropriateness, Mother recognizes that A.M.'s health is good and that she did not suffer any negative effect from Father's choice not to pursue some specific recommendations regarding her POTS treatment.[25] She opposes Father's choices regarding some dental issues for both their sons,[26] but Father has taken them for dental care and is following the recommendations he received.[27] She submitted photos of Father's home taken without his knowledge.[28] While the Court recognizes significant clutter and possibly unwashed laundry

---

[24] *See e.g.* Tr. at 94-95 (Education), 61-63, 70 (Medical),107-109 (Needs/Living Conditions) (June 11, 2019).

[25] Tr. at 16-17 (June 20, 2019).

[26] Tr. at 60-61, 69 (June 11, 2019).

[27] *Id.* at 144-145.

[28] *Id.* at 46, 89.

being present, these photos neither establish that the Children constantly experience substandard living conditions in Father's home, nor do they outweigh the other evidence of Father's ability to meet the Children's needs.

The Court weighed Custody Factor #4 in Father's favor. Neither parent would have ensured educational continuity for the Children, as they each sought relocation to communities in other school districts. However, Father seeks to move from Churchill to Monroeville, a community only minutes away from the current residence. Father's proposal affords the Children an opportunity to maintain current important school friendships and some participation in the same teams.[29] While the Children report enjoying Mother's new neighborhood, its location is farther from Churchill and consequently does not offer them equivalent opportunities to maintain existing friendships from school and activities.

The Court viewed Custody Factor #5 as neutral between the parties. Both parents have extended family. Nothing about the Court's custody decision threatens or jeopardizes the Children's relationships with extended family, as they will continue to have opportunities to see their relatives.

The Court viewed Custody Factor #6 as neutral. The Court did not establish different custody schedules for separate children. The three siblings will continue to be raised together.

---

[29] *Id.* at 129, 131-132, 181.

The Court weighed Custody Factor #7 and Relocation Factor #4 in Father's favor. Unfortunately, the Court cannot achieve the Children's strongest preference, which is for the constant conflict between Parents to end. However, the evidence supports the Court's conclusion that granting Father's proposal better ensures achievement of one of their other preferences, namely to participate in a variety of organized sports. In the 2018 custody hearing and again in the modification hearing, Mother testified to her desire to limit the Children's participation,[30] yet sports participation has remained very important to the Children, and they excel at several sports.[31] Father continues to support their ongoing participation.[32] Mother prioritizes school, but fails to recognize that the Children have performed well in school, and their sports participation has not detracted from that.[33] Transportation to sports on Mother's custody days constitutes a major subject of conflict between Parents.[34] Thus, granting Father's proposed custody modification ensures that the Children spend more time with the parent who prioritizes their preference and has the side benefit of reducing/limiting

---

[30] Tr. at 73 (June 20, 2019).

[31] *See generally,* Children's Testimony at 13-16, 19 (J.M.), 39-45, 50 (S.M.), 57-60 (A.M.) (June 11, 2019).

[32] Father's support of Children's participation extends to skiing, a sport the Children enjoy, but which the family cannot afford. Mother apparently finds resources to pay for skiing, and Father ensures they can participate, including on his custody days.

[33] *See* Mother's Proposed Custody Schedule, Mother's Exhibit K2 at 1 ("SCHOOL IS #1 PRIORITY AT ALL TIME").

[34] Tr. at 149-154 (June 11, 2019).

14

conflict with Mother, since Father handles transportation arrangements on his custody days.[35]

The Court viewed Custody Factor #8 as not applicable. The evidence did not reflect any significant attempt by either parent to turn the Children against the other parent, although they do both speak negatively about the other in front of the Children.[36]

The Court viewed Custody Factor #9 as neutral. Unfortunately for the Children, neither parent can effectively attend to the Children's emotional needs unless Parents find a way to eliminate, or at least significantly reduce, the conflict between them. The evidence shows Mother's frequent instigation and/or exacerbation of conflict, but Father also initiates conflict at times, and sometimes prolongs it by engaging with Mother.[37] Continuing this chronic pattern does not meet the Children's emotional needs.

---

[35] The Court notes that it gave little weight to Mother's testimony regarding the Children's preferences, as the Children's testimony provided a more direct and credible source of the information. In addition, Mother has given the Court reason to doubt her ability to convey the Children's desires accurately. *Compare* Children's Testimony at 78-79 (A.M. regarding high school choices) (June 11, 2019), Tr. at 65-66 (Mother regarding Children's school preference) (July 5, 2019).

[36] Children's Testimony at 73-74 (A.M.) (June 11, 2019).

[37] *See e.g.* Father's 2019 Custody/Relocation Exhibits #11, #15, #16, #23, #49, #53, #68; Mother's Custody/Relocation Exhibits G29-G32.

The Court viewed Custody Factor #10 as neutral. Both parents attend to the Children's daily needs. The Court's discussion of Custody Factor #3 applies to this factor as well.

The Court weighed Custody Factor #11 in Father's favor. The parties previously resided very near each other. Father has not yet moved, and proposes a move that is an easy drive within minutes of his current residence.[38] Mother has already moved and chose a community that is not far in terms of mileage, but that increases the distance between the parties and makes physical custody logistics more difficult.[39]

The Court viewed Custody Factor #12 as neutral. Both parties are able to make appropriate child care arrangements if they are not available during their custody periods.

The Court weighed Custody Factor #13 in Father's favor. At the time of the 2018 custody hearing, Mother demonstrated no ability to cooperate with Father. Nothing in the current record indicates improvement in her conduct. A.M., revealing considerable insight into her parents, testified that Mother never changes her opinion about anything.[40] At times, Mother refuses to cooperate with Father at

---

[38] Tr. at 19-20 (June 20, 2019) (Father's proposed residence approximately five miles from current home).

[39] *See* Tr. at 134-135 (June 11, 2019); Tr. at 13-16 (June 20, 2019) (discussing logistics of three school start times).

[40] Children's Testimony at 81 (June 11, 2019).

the expense of meeting the Children's needs. For example, at Mother's urgent request, Father scheduled an emergency dental appointment for J.M. to have a tooth examined. In response, Mother refused to allow Father to take J.M. to the dental appointment because the appointment was scheduled during her custodial time.[41] Mother also initiates unnecessary conflict by making demands on Father that he has no obligation to meet.[42] Thus, while the Court recognizes that Father contributes to the conflict between the parties, to the emotional detriment of the Children, Father remains more able to cooperate and less responsible for pursuing conflict.[43]

The Court viewed Custody Factors #14, 15, and 16 and Relocation Factor #10 as not applicable.

The Court viewed Relocation Factors #1 and 2 as neutral. These two factors address the nature and quality of the Children's relationships with each parent and any likely developmental impact on the Children of the relocation. The Children love both their parents and have well-established relationships with both. The

---

[41] *See* Tr. at 46-47 (January 31, 2019); Father's Custody Contempt Exhibits Medical #4, #5, #6; *See also* Appendix B at 3 (Mother's refusal to refusal to give up some custody time for A.M. to attend a special tutoring session).

[42] *See e.g.,* Appendix B at 6-7; Father's Custody Contempt Exhibits Education #20 - #22 (School information that Mother has access to); Tr. at 237-239 (January 31, 2019)(Mother's insistence that Father keep appointments scheduled by her with providers selected by her at times after Father became sole legal custodian); Father's Custody/Relocation Exhibit #22, #23 (Mother demands that Father pay skiing expenses, contrary to May 25th Order).

[43] *See e.g.,* Tr. at 150-151 (June 11, 2019) (Father no longer answers calls from Children that occur one hour prior to practices to limit conflict over transportation logistics).

17

parties' proposed relocations keep them both within Allegheny County, and need not have any major impact on the Children apart from the necessary change in schools.

The Court weighed Relocation Factor #3 in Father's favor. As mentioned above, Parents are remaining relatively near each other, so the Children's relationship with each parent can easily be preserved. However, Mother's choice of location makes custody logistics more difficult. For example, the three children will have three different starting and ending times for their school day in the 2019/20 school year.[44] Because Mother chose to move farther away, she will either have to require all three children to leave in the morning in time for the earliest start, or she may have to make several round trips from home on school mornings. Similarly, the transportation logistics for organized sports have already been difficult and will likely become more so for Mother on her custody days.[45] If Mother had chosen to move to another residence in or nearer to Churchill, she could have avoided these logistical problems.

The Court weighed Relocation Factor #6 in Father's favor. Father testified regarding how his proposed move to Monroeville will improve his quality of life. He will reduce his housing expenses, as his anticipated rent will be less than the

---

[44] Tr. at 14-15 (June 20, 2019).
[45] *See* Children's Testimony at 68-69 (June 11, 2019) (A.M. notes that Aspinwall location heightens transportation burden).

18

community where the family resided in the past and where he still has friends and a support network.[47] In contrast, Mother chose her new residence solely because she believes that the Children should attend school in Fox Chapel School District,[48] not because of some demonstrable improvement in her own quality of life.

The Court viewed Relocation Factor #7 as neutral. The Children like Mother's new neighborhood, but they do not express any particular desire to attend school there or any particular belief that going to school there would improve their lives.[49] Father has not moved yet, but the Children do not express any particular dislike for his proposed new community, though A.M. did have some reservations about her lack of current friends in Gateway School District.[50] Father has visited the schools and notes opportunities that Gateway School District offers that were not available in Woodland Hills.[51] Mother, who detests the Woodland Hills School District and regularly characterizes it as the worst or among the worst in the state, herself submitted school performance data suggesting that Gateway's students perform much better on a variety of measures.[52]

---

[46] Tr. at 21 (June 20, 2019).
[47] Tr. at 132-133 (June 11, 2019).
[48] Tr. at 29 (June 20, 2019).
[49] *See generally,* Children's Testimony (June 11, 2019).
[50] *Id.* at 71-72.
[51] Tr. at 126, 128-130 (June 11, 2019).
[52] Mother's 2019 Custody/Relocation Exhibits F58-F59.

19

Mother portrays Aspinwall as a near-utopia and touts Fox Chapel School District's high ranking in popular school ranking data and positive news items about Fox Chapel schools.[53] As the Court observed to the parties, this kind of evidence does not speak to how/whether the parties' own individual three children would have a positive experience of Fox Chapel's schools or be better served there than elsewhere. In contrast, Mother portrays Father's proposed move as exposing the Children to significant danger, pointing to crime statistics for Pitcairn, which is not the municipality where Father desires to relocate.[54]

On balance, the record does not contain evidence persuasive enough to demonstrate that either proposed move necessarily amounts to an improvement in the Children's quality of life.

The Court weighed Relocation Factor #8 in Father's favor. Mother's opposition to Father's proposed relocation to Monroeville makes no sense at all, since it prevented the Children from moving out of a school district she detests to one that performs far better in the kinds of rankings that Mother believes important, and the move would otherwise have had little if any impact on custody arrangements. Mother's sole expressed reason for moving to Aspinwall was unrealistic, since she chose the location solely because of the school district when

_____

[53] *See* Tr. at 80-82, 86-87 (June 11, 2019); Mother's Custody/Relocation Exhibit F17-F27.
[54] Tr. at 83, 111-112 (June 11, 2019) (Characterizing Pitcairn as "pretty much the murder capital in Western Pennsylvania").

she lacked authority to choose the Children's schools.[55] In contrast, Father chose a new location based on rational expectations that he could reasonably anticipate fulfilling.[56]

Overall, the record supports the Court's weighing of the custody and relocation factors, and consequently supports the Court's decision to grant Father's requested custody modification, as well as his proposed relocation.

## C. Mother has failed to identify any abuse of discretion or legal error that warrants reversal.

The above analysis addresses many of Mother's specific complaints. Mother's Errors #5 and 6 merit some additional discussion.

Errors #6(a) through (d) all challenge aspects of Father's sole legal custody and represent challenges repeated from Mother's 2018 appeal. Error #6(b) reflects Mother's continued misunderstanding of the May 25th Order, which the Court has previously addressed.[57] Regarding the other asserted errors, the Court notes that the evidence from the 2018 proceeding, which took place only a year prior to the current proceeding, compelled the Court to award sole legal custody to Father, due to Mother's inability to cooperate, her inability to conduct civil interactions with schools and health care providers, and her efforts to undermine and block Father's

---

[55] Tr. at 29 (June 20, 2019).
[56] Tr. at 125-133 (June 11, 2019); Tr. at 20-22 (June 22, 2019).
[57] *See* Appendix A at 21-22.

21

reveals no improvement in Mother's ability to cooperate. The May 25th Order has provided Father with both the opportunity and the responsibility to fulfill the parental decision-making role he desired. The record of the current proceeding reveals that he has for the most part risen to the occasion and performed his parental duties responsibly. Consequently, the record supports the Court's decision to maintain the status quo on legal custody.

Mother's Errors #5 and #6(f) through (j) all challenge aspects of Father's primary physical custody. Errors #5, 6(f), and 6(j) seem to the Court to challenge the Court's decision to somewhat reduce Mother's physical custody time by modifying the summer custody schedule. However, the actual change does not amount to a huge reduction.

Under the May 25th Order, the parties shared custody equally in the summer, with each parent having approximately 40 custody days, including the accompanying overnights. The parties alternated weekends, with weekend custody beginning at 9:00 am on Friday and ending at 9:00 am on Monday.

Under the July 5, 2019 order, the parties continue to alternate weekends. Father's weekends, however, now begin later -- on Fridays at 3:00 pm, instead of at 9:00 am. Mother's weekends now end on Sundays at 6:00 pm, instead of extending to Monday morning. However, Mother's weekends essentially begin on

Thursdays at 9:00 am, a full 24 hours earlier than under the May 25th Order. The modified order does result in a loss for Mother of 11 nights of custody time. When examined in terms of the number of days that include significant daytime custody for Mother, the modified custody schedule provides for approximately 40 – exactly the same number as under the May 25th Order.

This type of reduction will not damage Children's well-established bond with Mother. The Court recognizes that the change does not reflect the Children's preference for allocation of their time, and the Court has addressed this above in its discussion of Custody Factor #7 and Relocation Factor #4.

Errors #6(g) through (i) merit no relief. As the Court observed in its 2018 opinion, trial courts must necessarily exercise considerable discretion in drafting the details of custody orders. The Court believes the specific details challenged by Errors #6(g) and (h) fell within the Court's discretion to fashion. Error #6(i) constitutes a misunderstanding of the custody schedule that the Court addressed in the 2018 opinion.[58]

Error #6(e) repeats a challenge addressed by the Court in the 2018 proceeding.[59] As was the case in that proceeding, the asserted error arises from a misunderstanding of the May 25th Order and merits no relief.

---

[58] *See* Appendix A at 23-24.
[59] *Id.* at 22-23.

for the judge." Consequently, the Superior Court should deem these issues waived.[62]

## V.  Conclusion.

For the reasons detailed above, the Superior Court should reject Mother's issues for review and affirm this Court's July 5, 2019 order.

By the Court:

The Honorable Eleanor L. Bush

---

[62] *See* Pa. R.A.P. 1925(b)(4)(vii); *Commonwealth v. Lord,* 719 A.2d 306, 308 (Pa. 1998); *Commonwealth v. Dowling,* 778 A.2d 683, 686 (Pa. Super. 2001); *Commonwealth v. Heggins,* 809 A.2d 908, 911 (Pa. Super. 2002).